**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ANTHONY SANSEVERINO,<br>*Plaintiff*,<br>v.<br>DARRIUS CONAWAY, JAKUB MAJEWSKI, and JOHN PRISAVAGE,<br>*Defendants*. | No. 3:24-cv-01672-MPS |

# RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

## I. Introduction

The plaintiff, Anthony Sanseverino, brings this civil rights action against New Britain police officers Darrius Conaway, Jakub Majewski, and John Prisavage (collectively, the "Defendants"). Sanseverino alleges that the Defendants unlawfully searched his Mini Mart, falsely arrested him, maliciously prosecuted him, and destroyed evidence. Sanseverino and the Defendants filed cross-motions for summary judgment. For the reasons set forth below, the Defendants' motion is GRANTED and Sanseverino's motion is DENIED.

## II. Factual and Procedural History

### A. Factual Background

The following facts are taken from the parties' Local Rule 56(a) Statements and exhibits and are undisputed unless otherwise indicated.

Sanseverino owned and operated the Palace Mini Mart convenience store (the "Mini Mart"), located at 246 North Street in the City of New Britain, Connecticut. ECF No. 66-2 ¶ 1. Conaway, Majewski, and Prisavage were municipal employees of the New Britain Police Department ("NBPD"). *Id.* ¶ 2. Prisavage was a Sergeant and Conaway and Majewski were Detectives. *Id.*

**i. The Three "Controlled Buys"**

On September 22, 2021, a Confidential Informant (the "C.I.") contacted Conaway regarding the illegal sale of narcotics at the Mini Mart. ECF No. 66-2 ¶ 3. The Defendants contend that Conaway assessed the C.I. as credible because the C.I. had previously given information to the NBPD regarding narcotics trafficking within the City of New Britain, which was verified through police investigation. *Id.* ¶ 4; ECF No. 58-9 at 4–9 (Conaway testifying that the C.I. had provided information and participated in controlled buys that directly led to the arrest of another individual prior to the investigation of Sanseverino). Conaway requested that the C.I. conduct controlled drug purchases from the Mini Mart, and the C.I. agreed to do so. ECF No. 66-2 ¶¶ 5, 10, 15. Three controlled buys occurred at the Mini Mart on September 22, 2021, October 4, 2021, and October 18, 2021. ECF No. 66-2 ¶¶ 5, 10, 15.

Prior to each controlled buy, the C.I. met with Conaway and another officer[1] at a pre-arranged location. *Id.* ¶¶ 5, 10, 15. The parties disagree as to the extent the officers searched the C.I. for money and contraband before sending him to the Mini Mart. *Id.* at 12 ¶ 4. The parties agree that the C.I. was not strip searched. ECF No. 68-1 ¶ 65. Sanseverino contends that the C.I. was "solely patted down" while seated in the officers' vehicle, but the Defendants point to evidence that the searches included a "check of his pockets, anywhere he would be possibly able to store contraband." *Id.*; *see also* ECF No. 61-17 at 3 (Prisavage explaining that a typical search includes "searching inside the pockets, searching the person, searching quadrants, say upper body left, upper body right. Inside pockets, pat down the waistline. Search the pockets, any pant pockets, top

---

[1] Conaway was accompanied by Prisavage on September 22, 2021, and October 18, 2021. ECF No. 66-2 ¶¶ 5, 15. Conaway was accompanied by Majewski on October 4, 2021. *Id.* ¶ 10.

of the socks if they're wearing shorts, pulling up the pants, a complete research of the person but not a strip search.").

Before each controlled purchase, the officers provided the C.I. with prerecorded funds and equipped the C.I. with a live video and audio device, and Conaway instructed the C.I. to travel directly to the Mini Mart without stopping. ECF No. 66-2 ¶¶ 5, 10, 15. On each occasion, video and audio recorded the C.I. traveling to and from and inside the Mini Mart, and Conaway viewed the video feed live from his work phone. *Id.* ¶¶ 6, 11, 16. Each time after leaving the Mini Mart, the C.I. returned to the prearranged meeting location.[2] ECF No. 66-2 ¶¶ 6, 11, 16.

The parties dispute whether the C.I. obtained illegal narcotics from Sanseverino at the Mini Mart during any of the three controlled purchases. ECF No. 66-2 at 12 ¶ 1. The parties agree that the video footage obtained from the C.I. does not depict any drug transactions. ECF No. 68-1 ¶ 7. On the videos, the C.I. can be seen or heard purchasing a jar of jalapeno peppers, potato chips, candy, and a cigarette, and, on one occasion, receiving change from Sanseverino. ECF No. 68-1 ¶¶ 6, 11; ECF No. 66-2 ¶¶ 8, 11, 16; ECF No. 61-14 ¶¶ 5–7; *see* ECF No. 58-12 (246 North St 3rd Buy_ 21-027536) at 5:49.

---

[2] Sanseverino contends that on October 18, 2021, before returning to the prearranged meeting location, the C.I. is recorded complaining to unidentified persons on the street after leaving the Mini Mart that he is unable to find a "plug." ECF No. 60-2 ¶ 17. The Defendants point to video evidence that the conversation in question occurred during the second controlled buy on October 4, 2021, however, and that the C.I. did not use the term "plug," but instead stated, "[e]very time I be lookin' for it but I never find it." ECF No. 68-1 ¶ 17; *see* ECF No. 58-12 (246 North St 2nd Buy_21-027536) at 6:43. The footage also indicates that, prior to leaving the store on October 4, 2021, the C.I. said, "You're gonna have to plug me in with your people man stop playing." *Id.* at 5:56. When a party's version of events is utterly discredited by video footage of those events, the Court views the facts "in the light depicted by the videotape" rather than relying on the party's account. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (in ruling on motion for summary judgment, courts should view "the facts in the light depicted by the videotape" rather than a party's "version of events [that] is so utterly discredited by the record that no reasonable jury could have believed [it]").

Sanseverino denies that any drug transaction took place between himself and the C.I. during any of the planned controlled purchases. ECF No. 66-2 ¶¶ 8, 13. Sanseverino relies on the C.I.'s written statement denying ever having purchased crack cocaine from Sanseverino. ECF No. 66-2 ¶¶ 7, 9, 13. Sanseverino refers to the C.I.'s written statement as a "sworn affidavit," ECF No. 66-2 ¶ 9, and asserts that he signed the statement "before a notary public." ECF No. 74 at 1. In the Second Circuit, sworn statements that are "made under penalty of perjury . . . should be treated as evidence in deciding a summary judgment motion." *Scott v. Coughlin*, 344 F.3d 282, 289 (2d Cir. 2003). But "unsworn statements must conform with 28 U.S.C. § 1746, which requires that the unsworn statement contain the phrase 'I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.'" *Monclova v. City of New York*, 726 F. App'x 83, 84 (2d Cir. 2018) ("None of [the] interrogatories were sworn under oath. Therefore, the district court did not err in disregarding them."). And "a district court should disregard an unsworn letter in ruling on a summary judgment motion." *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65 (2d Cir. 1999).

The C.I.'s statement, a grainy image of a handwritten page apparently torn from a notebook on which a "sticky" had been placed, reads, in relevant part: "I . . . hereby swear that there is no one threatening me in no way shape or form [and I] would like it to be known that I did not buy any drugs or crack cocaine from Anthony Sanservino on October 4 [or] October 18. I did not buy any drugs from 248 North St. store from Anthony Sanseverno." ECF No. 61-13 at 1. The statement is dated and contains the C.I.'s address and date of birth. *Id.* But the C.I.'s name, in both the statement and the area where it seems he signed it, are scribbled out and illegible. "Rule 56(e)'s requirement that affidavits opposing summary judgment 'set forth specific facts' is not satisfied by an affiant whose identity is not disclosed[.]" *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206,

223 (2d Cir. 2004). While there was good reason not to *publicly* disclose the C.I.'s name, Sanseverino has not pointed the Court to a sealed filing that discloses the name of the person who purportedly signed the statement.

The statement contains no reference to an oath and no statement swearing "to the truth of the document" or "under penalty of false statement," and bears no indica of being sworn before a notary or other "proper officer." Conn. Gen. Stat. §1-24(a). The statement does not say that it was subscribed "under penalty of perjury," or that it is "true and correct," and does not contain any equivalent declaration in "substantially" those forms. 28 U.S.C. § 1746. In the bottom right-hand corner of the document, there appears to be a blurry set of four lines that theoretically could be a notary's notation indicating when the notary's commission expires. ECF No. 61-13 at 1. If it were and if a stamp were visible, this would corroborate Sanseverino's argument that the statement was "signed before a notary public." ECF No. 74 at 1. But the image is so blurry that no text whatsoever can be discerned to corroborate whether it is in fact a notary's notation, and Sanseverino has offered no other evidence to corroborate that the document was notarized. I find that Sanseverino has not offered enough evidence to show that the statement "is what [he] claims it is," *i.e.,* a "sworn affidavit." Black's Law Dictionary (12th ed. 2024) (defining "affidavit" as "[a] voluntary declaration of facts written down and sworn to by a declarant . . . before an officer authorized to administer oaths"); Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."); *see also Barlow v. Connecticut*, 319 F. Supp. 2d 250, 257 (D. Conn. 2004), *aff'd sub nom.*, 148 F. App'x 31 (2d Cir. 2005) ("The documents submitted in opposition to a summary judgment motion must be properly authenticated in order to be considered by the court at summary judgment stage."); *Dean v. New York Marriott*

*Fin. Ctr. Hotel*, 1998 WL 574382, at *5 (S.D.N.Y. Sept. 8, 1998) (on summary judgment, "the court can only consider records which it can understand. Any records that are illegible or incomplete are considered with this limitation in mind."). Because the C.I.'s written statement is unsigned, unauthenticated, not sworn before a notary, and not made under the penalty of perjury, I do not consider the statement as evidence.

Sanseverino also relies on the absence of any imagery from the videos that shows a drug transaction. ECF No. 66-2 ¶¶ 7, 13, 19. Defendants maintain, however, that the videos of the controlled buys do not disprove that the C.I. bought crack cocaine from Sanseverino during the controlled purchases.[3] ECF No. 68-1 ¶¶ 6–7, 16. Defendants contend that, upon returning to the meeting location after each controlled purchase, the C.I. handed Conaway a quantity of a white, rock-like substance as well as other items of store merchandise,[4] and each time explained to Conaway that he had purchased the substance from a white male wearing glasses working behind the store counter. ECF No. 66-2 ¶¶ 7, 12, 17. It is undisputed that the physical characteristics of the male cashier described by the C.I. fit the description of Sanseverino, *id*. ¶ 7, and that on one occasion Conaway identified the cashier as Sanseverino by viewing the video recording. *Id*. ¶ 12. Defendants contend that Conaway, using his training and experience as a police officer, positively identified the white, rock-like substance as crack cocaine. *Id*. ¶¶ 7, 12, 17. Sanseverino admits only that the C.I. handed Conaway merchandise he purchased from the Mini Mart, however, and denies

[3] In her ruling on a motion to compel the identity of the C.I., Magistrate Judge Garcia noted that "the videos do not capture the drug transactions; however[,] the videos do not show that a drug transaction or transactions could not have occurred." ECF No. 40 at 6.

[4] During the three controlled buys, the C.I. purchased the following items from the Mini Mart: a jar of jalapeno peppers on September 22, 2021, two bags of chips on October 4, 2021, and a bag of candy and a loose cigarette on October 18, 2021. ECF No. 66-2 ¶¶ 7, 8, 11, 16; ECF No. 68-1 ¶¶ 6, 11. The C.I. turned these items, except for the bag of candy, over to the police following each controlled buy. ECF No. 66-2 ¶¶ 7, 11, 16.

that the C.I. told Conaway that he purchased narcotics from Sanseverino. *Id.* ¶¶ 7, 12, 17; *see also id.* ¶ 8 (Response) ("The recorded video footage demonstrates that no such conversation took place."). Defendants claim that the C.I. did not obtain narcotics from anyone else. *Id.* ¶¶ 12, 17 (citing Conaway's deposition testimony that the officers "make sure [the C.I.] doesn't . . . purchas[e] drugs from another place," ECF No. 58-9 at 20). But Sanseverino denies that the officers determined whether the C.I. obtained narcotics from anyone else. *Id.* ¶¶ 12, 17.

Supplemental Police Reports state that Conaway field tested the white, rock-like substances obtained by the C.I. during each of the three controlled buys and identified the substances as crack cocaine using "NARK II Cocaine ID wipe[s]." ECF No. 66-2 ¶ 20; *see, e.g.,* ECF No. 58-14 at 7. Sanseverino points to the lack of photographic evidence or test results proving that the substances were field tested but he does not—and cannot—deny that Detective Conaway states in his police report that "[a] sample of the white, rock, like substance was subjected to a field test utilizing a 'NARK II Cocaine ID' wipe which yielded positive results to contain cocaine." ECF No. 58-14 at 7. Defendants contend that the store merchandise[5] and the three quantities of crack cocaine recovered during the controlled buys are stored in evidence bags, ECF No. 66-2 ¶¶ 21–23, but Sanseverino denies that any amount of crack cocaine was recovered and admits only that the store merchandise obtained during the controlled buys was stored as evidence. *Id.*

**ii. The Search and Arrest**

On October 21, 2021, as part of an application for an arrest warrant, "Conaway submitted an affidavit, subscribed to by Prisavage, representing that, on or about October [4], 2021,[6] probable

---

[5] The jar of jalapeno peppers, the two bags of chips, and the loose cigarette. ECF No. 66-2 ¶¶ 21–23.

[6] I presume the reference in the Local Rule 56 Statement to October 3 is a typo, as the other evidence in the record identifies the date of the second controlled buy as October 4, 2021. *See* ECF No. 61-3 at 1 (warrant application describing October 4, 2021 controlled purchase).

cause for Sanseverino's arrest existed for the crimes of Possession of Narcotics in violation of Conn. Gen. Stat. § 21a-279(a)(1), and Sale of Narcotics in violation of Conn. Gen. Stat. § 21a-277(a)(1)(A)." ECF No. 66-2 ¶ 14; ECF No. 68-1 ¶ 19; ECF No. 61-3. A state court judge issued a warrant on the same date "charging [Sanseverino] with one count" of each crime and setting bond at $50,000.00. ECF No. 66-2 ¶ 14; ECF No. 68-1 ¶¶ 20, 27. The next day, as part of a second arrest warrant application, "Conaway submitted a second affidavit, subscribed to by Prisavage, where he represents that, on or about October 1[8], 2021,[7] probable cause existed for Sanseverino's arrest" for the same two crimes. ECF No. 66-2 ¶ 25; ECF No. 61-4. A state court judge issued a warrant on the same date "charging" Sanseverino with one count of each crime and setting bond at $500,000.00. ECF No. 68-1 ¶¶ 23, 26, 27; ECF No. 66-2 ¶ 25.

The details in the two arrest warrant affidavits are substantially the same. *See generally* ECF No. 61-3; ECF No. 61-4. In both, Conaway asserted that "[t]he C.I. stated that [Sanseverino] handed [him] crack cocaine in exchange for cash." ECF No. 68-1 ¶¶ 8, 12; ECF No. 61-3 at 2; ECF No. 61-4 at 2. "Conaway swore under oath that he viewed the footage and was able to 'corroborate the CI's recollection of events,' and that he 'was able to identify the white male behind the counter and conducting the drug transaction as Anthony Sanseverino.'" ECF No. 68-1 ¶¶ 9, 13; ECF No. 61-3 at 3; ECF No. 61-4 at 3 (stating that Conaway "was able to identify the white male behind the counter as Anthony Sanseverino."). Conaway stated that the packages of crack cocaine were taken back to the NBPD and secured in a storage locker. ECF No. 68-1 ¶ 14; ECF No. 61-3 at 3; ECF No. 61-4 at 3.

---

[7] I presume the reference in the Local Rule 56 Statement to October 17 is a typo, as the other evidence in the record identifies the date of the third controlled buy as October 18, 2021. *See* ECF No. 61-4 at 1 (warrant application describing October 18, 2021 controlled purchase).

On October 21, 2021, Conaway and Majewski applied for a search and seizure warrant for the Mini Mart, ECF No. 61-8, averring in a sworn affidavit that probable cause existed for the search of the Mini Mart for the purpose of locating evidence of the offenses of Possession of Narcotics and Sale of Narcotics. ECF No. 68-1 ¶ 25; ECF No. 66-2 ¶ 24. A Superior Court judge issued a warrant the same day authorizing the search of the Mini Mart. ECF No. 68-1 ¶ 26; ECF No. 66-2 ¶ 24.

Each of the above three affidavits described the C.I. as "credible and reliable" and stated that information previously given by the C.I. has been "verified through police investigation" and deemed "truthful and reliable." ECF No. 61-3 at 1; ECF No. 61-4 at 1; ECF No. 61-8 at 2–3. The Defendants claim that the affidavits stated that the C.I. had felony convictions relating to narcotics and other offenses, ECF No. 66-2 ¶ 26, but in fact the affidavits do not include information about the C.I.'s criminal history. ECF No. 61-3; ECF No. 61-4; ECF No. 61-8.

On October 28, 2021, the Defendants, aided by other members of the NBPD, executed the search warrant at the Mini Mart. ECF No. 68-1 ¶ 28. During the search, Prisavage disconnected the surveillance cameras in the Mini Mart. ECF No. 66-2 ¶ 29; ECF No. 68-1 ¶ 30; ECF No. 58-13(Q) (Prisavage_SW_execution) at 12:20. Sanseverino asserts that the Defendants and other police officers damaged shelving units and merchandise inside the Mini Mart during the execution of the search warrant, resulting in loss of merchandise valued at approximately $900. ECF No. 68-1 ¶¶ 31, 67; ECF No. 66-2 ¶ 30 (citing photographs of the shelves and inventory after the alleged destruction). The Defendants, however, assert that the NBPD officers did not damage property at the Mini Mart during the execution of the search warrant. ECF No. 66-2 ¶ 30 (citing depositions of Majewski and Prisavage); *see* ECF No. 58-10 at 4 (when asked whether he or any other officer caused damage to the Mini Mart, Majewski responded, "Not that I recall. No."); *see also* ECF No.

58-11 at 13, 15, 16 (Prisavage deposition testimony denying knowledge or recollection of any damage to the Mini Mart or its inventory).

During the search, body camera footage shows an officer finding a small bag of cocaine in a common area located at the back of the store.[8] ECF No. 68-1 ¶ 29. Defendants assert that Conaway found on the floor a small plastic bag containing a white, rock-like substance, which he and two other officers recognized as crack cocaine. ECF No. 66-2 ¶ 31. The exhibits that the Defendants cite, however, show that Detective Kiely found the bag in question. ECF No. 58-9 at 35–36 (Conaway testifying that he did not seize anything at the Mini Mart during the search and responding to a photograph of an area of the Mini Mart with "that's probably where Chris Kiely found the crack cocaine"); ECF No. 58-11 at 8 (Prisavage replying "I believe it was" when asked if Detective Kiely was the officer who found the alleged crack cocaine during the search). The body camera footage shows that Detective Kiely removed a crate from behind a door to the cashier area and retrieved a small bag containing a white substance. ECF No. 58-13(M) (Kiely_on_scene) at 11:45–50; ECF No. 58-13(J) (Conaway_on_scene) at 11:43–12:10; *see also* ECF No. 58-13(Q) (Prisavage_SW_execution) at 25:57–26:06 (officer explaining to Prisavage that a "dub of crack" had been found and that "Kiely found it behind a door").

[8] In the Local Rule 56(a)(1) statement submitted with his motion for summary judgment, Sanseverino describes the object was "a small bag of cocaine." ECF No. 60-2 ¶ 29. Defendants admit that it was cocaine. ECF No. 68-1 ¶ 29. In his Local Rule 56(a)(2) statement in response to the Defendants' motion, however, Sanseverino denies that the bag discovered by Kiely contained cocaine and claims that the substance in the bag was not tested. ECF No. 66-2 ¶ 31. Because the Defendants admitted the fact that "Body camera footage shows an officer finding a small bag of cocaine in a common area located in the back of the store," ECF No. 68-1 ¶ 29, the fact is deemed admitted and established for purposes of this ruling. D. Conn. L. Civ. R. 56(a)1 ("Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement . . .").

The footage shows that Kiely returned the bag to its original location after initially picking it up, and Majewski photographed it in this location. ECF No. 58-13(M) (Kiely_on_scene) at 12:04–13:00; ECF No. 58-13(O) (Majewski_on_scene) at 12:10. Kiely then collected the bag after it was photographed and brought it to the front of the store, ECF No. 58-13(M) (Kiely_on_scene) at 13:00–20, where Kiely presented the bag to another officer and picked up an envelope. *Id*. at 13:25. Defendants contend that Kiely can be seen placing the crack cocaine in the envelope. ECF No. 73 at 7; *see* ECF No. 58-13(O) (Majewski_on_scene) at 13:04.

Sanseverino contends that another officer took the bag of crack cocaine found by Kiely and moved it, placing it on the floor of a hallway in plain sight. ECF No. 66-2 ¶ 31. The footage Sanseverino cites, however, does not support this proposition. ECF No. 58-13(E) (Axon_Body_3_Video_2021-10-28_2106_X60349660) at 11:18.[9] The footage Sanseverino describes matches Conaway's body camera footage at 28:27. ECF No. 58-13(J) (Conaway_on_scene). That footage shows that, approximately sixteen minutes after Kiely found the bag of alleged crack cocaine, Conaway lifted from the floor a small, off-white object contained in plastic. *Id.* at 28:27–35. *See also* ECF No. 58-13(O) (Majewski_on_scene) at 28:02. Conaway briefly examined the item before continuing to search the area, and it is not clear from the footage what Conaway did with the object after examining it. ECF No. 58-13(J) (Conaway_on_scene) at 28:30–35; ECF No. 58-13(O) (Majewski_on_scene) at 28:06.

Following the search, Conaway arrested Sanseverino under the arrest warrants, as well as for the "bag of cocaine" discovered "in the back of the store." ECF No. 68-1 ¶ 29; ECF No. 66-2 ¶ 32. Sanseverino was detained until he was able to post bond in the amounts of $75,000.00 and

---

[9] Sanseverino cited "SJ-23," ECF No. 66-2 ¶ 31, which corresponds to "Axon_Body_3_Video_2021-10-28_2106_X60349660," and was filed by the Defendants. ECF No. 60-3 (Notice of Manual Filing).

$600,000.00. ECF No. 68-1 ¶¶ 21, 24. Sanseverino was prosecuted in New Britain Superior Court in Docket Nos. H15N-CR21-0334335, H15N-CR21-0334336, and H15N-CR21-0334337. ECF No. 68-1 ¶ 34; ECF No. 66-2 ¶ 33.

**iii. Dismissal of Charges and Handling of Evidence**

On November 9, 2021, the State announced that it would not be pursuing any charges relating to the search of the Mini Mart that occurred on October 28, 2021. ECF No. 68-1 ¶ 35; ECF No. 66-2 ¶ 34.

William Durkin was employed as an investigator with the New Britain State's Attorney's Office, and was assigned to assist prosecutors with case preparation, including, among other things, gathering evidence. ECF No. 66-2 ¶ 35. Durkin conducted an investigation in connection with the charges in Docket Nos. H15N-CR-0334336 and H15N-CR-0334337. ECF No. 68-1 ¶ 41. On April 12, 2024, Durkin sent an e-mail to Officer Ramon Reyes, who was the assigned evidence officer at the NPBD, stating in relevant part: "Can you get these drugs to the lab when you have a chance?" ECF No. 66-2 ¶ 36. The e-mail identifies the following information relating to Sanseverino: his name, the Docket Numbers of the two criminal cases in which Sanseverino was being prosecuted in New Britain Superior Court, and the number assigned by the NBPD to its own investigative case, which began on September 22, 2021:

Anthony Sanseverino

CR21-0334336

CR21-0334337

21-027536 (2 buys/same case#)

(the "Durkin E-mail."). *Id.* ¶¶ 36–38. On April 16, 2024, Reyes responded to the Durkin E-mail stating: "Good morning Bill, I just wanted to [double] check on the case number you're requesting for because I've attached a court order signed by Judge Keegan on 01/19/2023 for this case

ordering the destruction of the drugs." (the "Reyes E-mail."). *Id.* ¶ 40. The "order signed by Judge Keegan on 01/19/2023" attached to the Reyes E-mail is a two-page document titled "Property Seized Under Search Warrant." *Id.* ¶ 41. The court order signed by Judge Keegan on 01/19/2023 was issued in connection with Docket No. H15N-CR21-0334335 and the substances recovered during the October 28, 2021, search of the Mini Mart, not in connection with Docket Nos. H15N-CR21-0334336, H15NCR21-0334337 and the substances recovered during the three controlled buys conducted at the Mini Mart. *Id.* ¶ 42. The items allegedly recovered during the three controlled buys were not destroyed and remain in the custody of the NBPD. *Id.* ¶ 44. But Sanseverino denies that these items include any crack cocaine. *Id.*

Justin Blain, an Assistant State's Attorney with the New Britain State's Attorney's Office, was assigned to prosecute the charges against Sanseverino in Docket Nos. H15N-CR-21-0334336 and H15N-CR-0334337. ECF No. 68-1 ¶¶ 45–46. On April 16, 2024, Durkin provided a copy of the Reyes E-mail to Blain. ECF No. 66-2 ¶ 46. Blain interpreted the Reyes E-mail, which refers to the police case number encompassing the controlled buy investigations, 21-027536, to communicate that all drugs, including those allegedly recovered in connection with Docket Nos. H15N-CR21-0334336 and H15N-CR21-0334337, were destroyed. *Id.* ¶ 47. When representing the State at a hearing on April 25, 2024, Blain sought dismissal of Docket Nos. H15N-CR21-0334336 and H15N-CR21-0334337 based on his belief that the Reyes E-mail communicated that all drugs connected with police case No. 21-027536 were destroyed. *Id.* ¶ 48. At that hearing, the court dismissed all charges relating to these cases. *Id.*; ECF No. 68-1 ¶ 47. Blain's belief that the drugs connected with Docket Nos. H15N-CR21-0334336 and H15N-CR21-0334337 were destroyed was based entirely on the Reyes E-mail. ECF No. 66-2 ¶ 49. Blain had no personal knowledge supporting his belief that these drugs were destroyed. *Id.*

On December 17, 2024, Defendants disclosed to Sanseverino a list of items, including the items allegedly obtained by the C.I., that included a description of each item, the "Inc. Date," the item number, custody status, and status date associated with each item. ECF No. 68-1 ¶ 49[10]; ECF No. 58-14 at 23. The "Inc. Date" for each item is listed as September 22, 2021. ECF No. 58-14 at 23. Sanseverino contends that this "Inc. Date" is meant to convey that all evidence was seized on September 22, 2021, ECF No. 66-2 ¶ 19, but Defendants assert that the "Inc. Date" instead refers to the New Britain Police Department investigative case, "Incident Report Number 21-027536," which began on September 22, 2021. ECF No. 68-1 ¶ 49; *see also* ECF No. 73 at 5 n.15.

### B. The Complaint

The operative complaint asserts causes of action for: false arrest/false imprisonment under Connecticut law (Count One) and 42 U.S.C. § 1983 (Count Five); malicious prosecution under Connecticut law (Count Two) and 42 U.S.C. § 1983 (Count Six); trespass under Connecticut law (Count Three); violation of the Police Accountability Act, Conn. Gen. Stat. § 52-571k (Count Four); unreasonable search and seizure under 42 U.S.C. § 1983 (Count Seven); and spoliation of evidence under Connecticut law (Count Eight). ECF No. 19.

Sanseverino and the Defendants have filed cross-motions for summary judgment. ECF Nos. 58, 60.[11] Both parties move for summary judgment on all counts and as to all defendants. ECF Nos. 58 at 1–2, 60 at 1.

---

[10] Sanseverino's 56(a)1 statements located at ECF No. 68-1 ¶¶ 49–52 omit citations to any evidence filed by Sanseverino. As the Defendants point out, no "SJ-5" or "SJ-13" exhibits exist, and there is no page 51 of the exhibit titled "SJ-12." The Defendants filed the "list of items" referenced in ECF No. 68-1 ¶¶ 49–52 at ECF No. 58-14 at 23.

[11] I permitted the Defendants to file supplemental briefs "to correct a factual error contained in limited portions of [Defendants'] memoranda." ECF No. 69; *see also* ECF No. 70. Accordingly, Defendants' corrected memorandum in support of their motion is ECF No. 71; Local Rule 56(a)(1) Statement is ECF No. 72; and reply brief is ECF No. 73.

## III. Legal Standard

Summary judgment will be granted only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (internal quotation marks omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). It is the movant's burden to "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the movant meets its burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Even then, summary judgment is only proper where "the record taken as whole could not lead a rational trier of fact to find for the non-moving party." *Id.*

In the context of cross-motions for summary judgment, the same standard is applied. *See Scholastic, Inc. v. Harris*, 259 F.3d 73, 81 (2d Cir. 2001). In deciding each motion, however, the court must construe the evidence in the light most favorable to the non-moving party. *Id.*

## IV. Discussion

### A. False Arrest and Malicious Prosecution (Counts One, Two, Five and Six)

The parties cross-move for summary judgment on the false arrest and malicious prosecution claims that Sanseverino brings under Connecticut and federal law. Because there was

probable cause for each of Sanseverino's arrests and prosecutions, the Defendants are entitled to summary judgment on these claims.

"Claims for false arrest . . ., brought under [Section] 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest . . . under state law." *Jocks v. Tavernier,* 316 F.3d 128, 134 (2d Cir. 2003). "Under Connecticut law, [f]alse imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." *Russo v. City of Bridgeport,* 479 F.3d 196, 204 (2d Cir.2007) (quotation marks omitted). In Connecticut, "a plaintiff must [also] show that the charges underlying the arrest terminated in his favor." *Williams v. City of Waterbury*, 2018 U.S. Dist. LEXIS 2097 *13 (D. Conn. 2018); *see Miles v. City of Hartford*, 445 Fed. Appx. 379, 383 (2d Cir. 2011) ("[F]avorable termination is an element of 'a section 1983 claim sounding in false imprisonment or false arrest.'") "And, in Connecticut, a false arrest claim cannot lie when the challenged arrest was supported by probable cause." *Russo,* 479 F.3d at 203; *see also Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) ("The existence of probable cause to arrest . . . is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983.") (citation omitted). "The existence of probable cause to arrest—even for a crime other than the one identified by the arresting officer—will defeat a claim of false arrest under the Fourth Amendment." *Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016). "[P]robable cause to arrest exists when police officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Zalaski v. City of Hartford,* 723 F.3d 382, 389–90 (2d Cir.2013) (quotation marks omitted). "[P]robable cause depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the

arrest, and . . . the probable cause inquiry is objective rather than subjective." *Jaegly v. Couch,* 439 F.3d 149, 154 (2d Cir.2006) (quotation marks omitted).

"Like false arrest . . . a malicious prosecution claim brought pursuant to section 1983 . . . as a violation of the Fourth Amendment . . . is substantially the same as a claim for malicious prosecution under state law." *Belton v. Wydra*, 2019 WL 2162718, at *8 (D. Conn. May 17, 2019) (internal quotation marks and citation omitted.) "To establish the tort of malicious prosecution, a plaintiff must prove: (1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." *Karwowski v. Fardy,* 118 Conn.App. 480, 486–87 (2009) (quotation marks omitted). "Because lack of probable cause is an element of a malicious prosecution claim, the existence of probable cause is a complete defense to a claim of malicious prosecution." *Stansbury v. Wertman*, 721 F.3d 84, 94–95 (2d Cir. 2013) (internal quotation marks omitted). "The probable cause standard in the malicious prosecution context," however, "is slightly higher than the standard for false arrest cases. Probable cause, in the context of malicious prosecution, has been described as [the existence of] such facts and circumstances [that] . . . would lead a reasonably prudent person to believe the plaintiff [is] guilty" of a crime. *Id.* at 95 (internal citation and quotation marks omitted.). "Although probable cause to prosecute is a complete defense to a claim of malicious prosecution, such probable cause must be shown as to each crime charged in the underlying criminal action." *Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021) (internal citations omitted).

The Defendants argue that summary judgment is warranted because they are entitled to qualified immunity on the false arrest and malicious prosecution claims under state and federal

law because they had "arguable probable cause" to arrest and prosecute Sanseverino. ECF No. 71 at 19–22. The Defendants briefed only the standard for qualified immunity under federal law, *id.* at 8–9, 19–21, however, and "state law governs a defendant's entitlement to qualified immunity with respect to state-law claims." *Jones v. Parmley,* 465 F.3d 46, 63 (2d Cir. 2006); *see also Mulligan v. Rioux*, 229 Conn. 716, 728 (1994) ("The standard of qualified immunity that protects public officials from civil suits pursuant to § 1983, arising from the performance of their discretionary functions, is distinct from that established under our common law."). Connecticut's version of qualified immunity is called "governmental immunity," and the Defendants asserted that doctrine as a defense in their answer along with the defense of qualified immunity. ECF No. 57 at 9–10. Because neither party briefed the issue of governmental immunity,[12] even if qualified immunity immunized the Defendants from the federal false arrest and malicious prosecution claims, it would not resolve the false arrest and malicious prosecution claims under Connecticut law. A finding of probable cause, however, would resolve all of these claims; so I begin by analyzing whether there was probable cause for Sanseverino's arrest and prosecution for each of the three crimes he was charged with.

It is undisputed that the underlying charges terminated in Sanseverino's favor. ECF No. 68-1 ¶ 35; ECF No. 66-2 ¶ 34. Sanseverino contends that there was not probable cause because the arrest warrants contained "deliberate misrepresentations and reckless omissions," ECF No. 60-1 at 5, and because there was no evidence that Sanseverino had constructive possession of the alleged bag of cocaine found in the Mini Mart. *Id.* at 11. Defendants, on the other hand, argue that there was probable cause based on the recovery of cocaine from the controlled purchases, ECF

[12] Sanseverino's opposition to the Defendants' motion discusses a specific statutory immunity available for claims under Conn. Gen. Stat. § 52-571k. ECF No. 66-1 at 16–18.

No. 71 at 21, and because officers found cocaine "located on the floor behind the register at the Mini Mart." *Id.* at 22. I discuss the warrantless arrest and then the arrests made pursuant to the warrant in turn.

**i. Warrantless Arrest for Possession of Narcotics**

When the NBPD executed the search warrant and found the bag of cocaine in the Mini Mart, officers arrested Sanseverino for Possession of Narcotics. ECF No. 66-2 ¶ 32; *see also* ECF No. 58-4 at 22 ("SANSEVERINO . . . was arrested for violation of Connecticut General Statute 21 a-279(a)(1) Possession of a Narcotic during the execution of a Search and Seizure Warrant . . . at 246 North Street . . . [where] .43 grams of crack cocaine was seized."). The Defendants are entitled to summary judgment for the false arrest and malicious prosecution claims relating to this arrest because there was probable cause for Sanseverino's arrest and prosecution.

Sanseverino argues that there could not have been probable cause for his arrest because the small bag of cocaine was found in an area of the Mini Mart over which Sanseverino did not exercise "dominion or control" and there was "zero evidence he was aware of its composition or existence." ECF No. 60-1 at 11–12. Under Conn. Gen. Stat. § 21a-279, "[a]ny person who possesses or has under such person's control any quantity of any controlled substance . . . shall be guilty of a class A misdemeanor." Possession under Connecticut law includes having "physical possession or otherwise . . . exercis[ing] dominion or control over tangible property." Conn. Gen. Stat. § 53a-3(2). "Constructive possession" means a defendant "exercised dominion and control over the [item], had knowledge of its presence, and had knowledge of its [ ] character." *State v. Williams*, 169 Conn. 322, 335 & n.2 (1975). "Control" is the "power or authority to guide or manage." *State v. Hill*, 201 Conn. 505, 516 (1986).

The body camera footage shows that the bag of cocaine was found by Detective Kiely during the search of the Mini Mart, which Sanseverino owned and operated, when Detective Kiely

removed a crate from behind a door next to the cashier area and retrieved a small bag containing a white substance. ECF No. 58-13(M) (Kiely_on_scene) at 11:45–50; ECF No. 58-13(J) (Conaway_on_scene) at 11:43–12:10; *see also* ECF No. 58-13(Q) (Prisavage_SW_execution) at 25:57–26:06 (officer explaining to Prisavage that a "dub of crack" had been found and that "Kiely found it behind a door"). The bag of cocaine was found near the cash register area, "in the back of the store." ECF No. 68-1 ¶ 29 ("Body camera footage shows an officer finding a small bag of cocaine in a common area located in the back of the store."); ECF No. 58-13(M) (Kiely_on_scene) at 11:45–50; ECF No. 58-13(J) (Conaway_on_scene) at 11:43–12:10. The area behind the door was dark and appeared to be for storage; it does not appear to have been an area customers would have visited or that was even visible to them. There was probable cause that, as the owner and operator of the store, Sanseverino had dominion and control over that area, and courts have made findings of probable cause against owner/occupiers in similar circumstances. *See, e.g., Jenkins v. City of NY*, 2013 WL 870258, at *8 (S.D.N.Y. Mar. 6, 2013) (officers had probable cause to arrest only adult tenant of apartment where large quantity of drugs was found); *United States v. Ambrosio*, 898 F. Supp. 177, 182 (S.D.N.Y. 1995) ("ownership of the pizzeria could support a probable cause finding . . . [where] Affidavit contained sufficient information to believe that drug negotiations were taking place at [the pizzeria] and Ambrosio, as the owner of the pizzeria, could be presumed to have knowledge of the activities occurring there."). Accordingly, the officers had knowledge of facts and circumstances that would lead a reasonably prudent person to believe that Sanseverino knew of the bag of cocaine's presence and character, that he exercised dominion and control over it, and thus that he was guilty of the crime of Possession of Narcotics. *Jaegly,* 439 F.3d at 154 ("[P]robable cause depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest, and . . . the probable cause inquiry is

objective rather than subjective."); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court."). Defendants, therefore, are entitled to summary judgment on the false arrest and malicious prosecution claims arising from the warrantless arrest.

Further, although I would reach the same conclusion even in the absence of the three earlier controlled buys, it is worth adding that by the time of the search, the C.I. had contacted the NBPD about the illegal sale of narcotics at the Mini Mart, and had conducted controlled buys there, ECF No. 66-2 ¶ 3, and two judges had issued warrants to arrest Sanseverino for the crimes of Sale of Narcotics and Possession of Narcotics, ECF No. 66-2 ¶ 14, 25, 32; ECF No. 68-1 ¶¶ 20, 23; as discussed below, I find that there was probable cause for Sanseverino's arrest and prosecution for those two crimes under the "corrected affidavit" doctrine. Those circumstances, which were known to the officers when they conducted the search, obviously bolstered their conclusion that there was probable cause to arrest Sanseverino for the cocaine found in the store.

**ii. Arrest Warrants**

Sanseverino's arrest for Possession of Narcotics and for Sale of Narcotics was pursuant to the October 21 and 22, 2021, warrants issued by state court judges. ECF No. 66-2 ¶ 14, 25, 32; ECF No. 68-1 ¶¶ 20, 23.

Because the arrest warrants were issued by judges who assessed that probable cause for his arrest existed, Sanseverino's arrest and subsequent prosecution are "presumed reasonable." *Walczyk*, 496 F.3d at 156. To overcome this presumption, "the plaintiff must make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was necessary to the finding of probable cause." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (internal quotation marks omitted). At summary judgment, Sanseverino must at least

raise material disputes of fact as to whether (1) "the affiant knowingly and deliberately, or with a reckless disregard of the truth, made false statements or material omissions in his application for a warrant," and (2) "that such statements or omissions were necessary to the finding of probable cause." *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994). "Though an officer need not volunteer every fact that arguably cuts against the existence of probable cause, the officer may not omit circumstances that are critical to the evaluation of probable cause." *Brown v. D'Amico*, 35 F.3d 97, 99 (2d Cir. 1994).

To evaluate a claim that officers misled the judge who issued the warrant by making false statements or deliberate omissions in the warrant application, I apply the "corrected affidavit doctrine":

> To determine whether a false statement was necessary to a finding of probable cause, we consider a hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information. If probable cause is lacking after such correction, then the false statement was necessary to secure issuance of the warrant. . . . On the other hand, if probable cause remains after the warrant is corrected, plaintiff has suffered no violation of Fourth Amendment rights[.]

*Ganek v. Leibowitz*, 874 F.3d 73, 82 (2d Cir. 2017) (internal citations and quotation marks omitted).

Sanseverino claims that in the affidavits for the arrest warrants, Conaway made the following statements that were either deliberately false or made with a reckless disregard for the truth: "(1) the video footage captured by the [C.I.] on . . . October [4] and October 1[18], 2021 corroborated [the C.I.'s] claim that he purchased narcotics from Plaintiff inside the Palace Mini Mart, when the footage does not corroborate or remotely resemble any such transaction; and (2) [the C.I.] was a reliable informant, despite a lack of a track record of successful previous encounters and his extensive criminal felony history for violent crimes, dishonesty, defiance of

court orders, and narcotic use." ECF No. 60-1 at 8. Sanseverino also argues that the affidavit falsely stated that the C.I. was thoroughly searched. *Id.* at 10.

*Video Footage*

I begin with the affidavits' discussion of the video footage. Conaway's affidavits discuss the second and third controlled purchases and state, in relevant part:

> The CI provided the following details in regards to the controlled drug purchase. The CI walked to 246 North Street and made contact with the white male who works at the store, behind the counter/cash register. The CI stated that the male handed the CI crack cocaine in exchange for cash and further stated that the male made the CI purchase two (2) bags of chips. . . . Your affiant viewed the footage and was able to corroborate the CI's recollection of events. Your affiant was able to positively identify the white male behind the counter and conducting the drug transaction as Anthony Sanseverino . . . after having several encounters with him as a police officer in the past.

ECF No. 61-3 at 2–3. *See also* ECF No. 61-4 at 2–3 (same except the affidavit states that "the male made the CI purchase a loose cigarette" instead of two bags of chips during that controlled buy). The parties agree that the video footage of the controlled purchases does not capture any drug transactions. ECF No. 68-1 ¶ 7. The Defendants argue, and I agree, that although the videos do not capture the alleged drug transactions, they do not show that such transactions could not have occurred. ECF No. 58-12 (246 North St 1st Buy_21-027536); ECF No. 58-12 (246 North St 2nd Buy_21-027536); ECF No. 58-12 (246 North St 3rd Buy_21-027536); ECF No. 68-1 ¶¶ 6–7, 16; *see also* ECF No. 40 at 6. I have reviewed the videos of the controlled purchases. They are of poor quality. The camera moves around constantly and, the vast majority of the time, does not show the C.I.'s hands, the male behind the counter at the Mini Mart, or what is happening on the counter at the Mini Mart during the controlled purchases. The camera is often covered by the C.I.'s hands or his clothing (such as if the camera was placed in the C.I.'s pocket), and sometimes the footage is completely dark as if the camera was set down on the counter. Large portions of the videos lack

any audio, and when there is audio, it is often possible to hear only the C.I.'s voice. The videos capture only very brief glimpses of the male behind the counter. All that I can confidently glean from the videos is that during each controlled purchase, the C.I. walked from a vehicle directly to the Mini Mart, entered the Mini Mart and stayed for long enough to conduct a transaction, and walked directly back.

The video of the first controlled purchase, which allegedly occurred on September 22, 2021, shows that the C.I. walked directly from a car to the Mini Mart. It appears to depict the C.I. taking something out of his back pocket while talking to the man behind the counter. ECF No. 58-12 (246 North St 1st Buy_21-027536) at 4:35. Then it briefly shows the counter and the C.I.'s hand outstretched to it, but the video is too pixelated or blurry to see what he is holding (if anything), what is on the counter (if anything), or what he is exchanging (if anything) with the individual behind the counter, the footage of whom is also too pixelated to make out. *Id.* at 4:46. The footage then depicts the body of a white male behind the counter, seen through the customer side of the candy display. *Id.* at 6:48–7:08. The white male's face is shown for just about a second, through what appears to be plexiglass separating the area behind the counter from the rest of the store. *Id.* at 7:10. The video again shows the C.I.'s hand outstretched onto the counter and the male behind the counter again through the plexiglass, though it does not show what, if anything, is on the counter. *Id.* at 8:00. The C.I. then left the Mini Mart and walked directly back to the vehicle. This first controlled purchase was not described in the two affidavits, and so neither affidavit needs correcting in this respect. I discuss it because it is consistent with the Defendants' accounts of the C.I.'s actions on October 4 and 18, 2021, at least insofar as he traveled directly to the Mini Mart, entered, and returned directly to the vehicle.

The video of the second controlled purchase—which occurred on October 4, 2021—also shows that the C.I. walked directly from a car to the Mini Mart. For the first minute or so that the C.I. is in the Mini Mart, there is no audio and the footage mainly captures the C.I.'s jeans and his hands on his legs. ECF No. 58-12 (246 North St 2nd Buy_21-027536) at 3:27–4:25. The C.I. approaches the counter, on top of which are two bags of chips. *Id.* at 4:38. The video then shows a white male behind the counter, who is wearing glasses, a baseball cap, and a hooded sweatshirt. *Id.* at 4:40–54. After some discussion between the C.I. and the male behind the counter, *id.* at 4:40–5:26, only some of which is audible and during which the counter is not visible, *id.*, the video goes completely black (as if the camera was set face-down on the counter) but continues to pick up audio. *Id.* at 5:26–58. Among other things, the C.I. says "you gonna have to plug me in with your people man, stop playing" as the C.I. picks up the camera. *Id*. at 5:56. He then exits the Mini Mart. *Id.* at 6:25. Approximately thirteen seconds after he leaves the Mini Mart, the C.I.'s camera depicts two individuals standing outside a doorway that appears to be illuminated in a red color. *Id.* at 6:38. The C.I. shakes both of their hands very quickly, *id.* at 6:38–41, and his empty right hand can be seen afterwards. *Id.* at 6:42. He then immediately walks away, stating, "every time I be lookin' for it but I never find it." *Id.* at 6:38–44. The C.I. then walks directly back to the car. Conaway failed to disclose this interaction in the affidavit that discussed the second controlled buy, ECF No. 61-3, and so I correct the affidavit to include the C.I.'s statements recorded on video and his interaction with the individuals on the street. I also correct the affidavit to reflect that no drug transaction was captured on the video. But the video does not show that the C.I., as Sanseverino contends, "deviated from a direct route back to Conaway . . . [or] engag[ed] in some type of a transaction" with them. ECF No. 60-1 at 9. The video does not depict any transaction between the C.I. and either of the two individuals he encountered on the street. The C.I. did not

pass the Mini Mart on his way back to the car, which suggests that he did in fact take a direct route back from the Mini Mart. Further, nothing in the video suggests that the C.I. went out of his way to interact with the individuals who were standing on the sidewalk only steps away from the Mini Mart.

In the video of the third controlled purchase, which occurred on October 18, 2021, the C.I. again walks straight from a car to the Mini Mart. The C.I. can be heard occasionally talking while the camera is pointed at a fridge of drinks and candy. ECF No. 58-12 (246 North St 3rd Buy_21-027536) at 3:50–4:50. The C.I. asks for something and how much it costs, *id.* at 4:50–5:05, and then a bag of shark candy can be seen on the counter. *Id.* at 5:12–5:20. The video then shows the C.I.'s hand holding some ten dollar bills over the counter above the shark candy. *Id*. at 5:21–36. One loose cigarette can be seen very briefly on the counter next to the shark candy. *Id.* at 5:37. The video then shows the same man behind the counter, also very briefly, who appears to have a cigarette in his mouth. *Id.* at 5:40. The shark candy and cigarette are then again shown on the counter, and the man behind the counter's hand is seen sliding cash and change back to the C.I. under the plexiglass. *Id.* at 5:44–48. The C.I. then reaches for the money from the counter. *Id.* at 5:50. The video is then completely dark for approximately sixteen seconds, *id.* at 5:52–6:08, until the C.I. picks up the camera and walks out of the Mini Mart. *Id.* at 6:08–6:12. The C.I. then walks directly back to the car. Conaway failed to disclose that no drug transaction was visible on the video, and so I correct the affidavit in this respect.

*The Confidential Informant*

The affidavits state that "[t]he CI has assisted the New Britain Police Department, the Special Services Unit in particular, with information in regards [to] narcotic trafficking within the city of New Britain. Information given by the CI has been deemed to be truthful and reliable which

was verified through police investigation." ECF No. 61-3 at 1; *see also* ECF No. 61-4 at 1 (same). Sanseverino contends that the C.I. was not credible because he had an extensive criminal history, which the affidavits omitted. ECF No. 60-1 at 8–10. The C.I. "has been convicted of nine felonies." ECF No. 68-1 ¶ 57. Accordingly, the hypothetical corrected affidavit would disclose the fact that the C.I. has nine felony convictions.[13]

Sanseverino also contends that the C.I. "has no proven history of providing information that led to arrests and convictions or the seizure of drugs." ECF No. 66-1 at 6. *See also* ECF No. 60-1 at 8 (" . . . despite a lack of a track record of successful previous encounters"). But the Defendants have submitted evidence showing that the C.I. had a track record of being a reliable source, and Sanseverino's assertion does not rebut that evidence. Conaway testified that the C.I. had participated in a controlled buy that led "directly to the arrest of another individual" and led "directly to the seizure of . . . narcotics" prior to the investigation of Sanseverino. ECF No. 58-9 at 7–8. When asked how many controlled buys the C.I. had conducted, Conaway answered: "It's hard to put a number on it, but if I had to guess, I would say he did in the high teens, maybe in the 20s, buys for me. Q. For you? A. Yes, sir. That's just an estimated number." *Id.* at 8. Accordingly, the affidavits' statements regarding the C.I.'s assistance to the NBPD were not false, nor did they contain material omissions, and therefore I do not "correct" the affidavit in this respect. *See Velardi*, 40 F.3d at 573 ("the plaintiff must show that the affiant . . . made false statements or

[13] Sanseverino contends that the C.I.'s convictions include "crimes of dishonesty and moral turpitude," ECF No. 60-1 at 10, but his convictions do not include crimes of "dishonesty." *See* ECF No. 68-1 ¶ 57; ECF No. 61-6 at 6–14 (C.I.'s criminal record); *United States v. Estrada*, 430 F.3d 606, 614 (2d Cir. 2005) (finding that "crimes of dishonesty that are automatically admissible for impeachment purposes" are those that "involve falsity or deceit" and explaining that "[w]hile much successful crime involves some quantum of stealth, all such conduct does not, as a result, constitute crime of dishonesty or false statement for purposes of Rule 609(a)(2)."). Further, that fact is not established in the parties' Rule 56(a)2 statements. *See* ECF No. 68-1 ¶ 57; *see also* ECF No. 66-1 at 14. Accordingly, I do not "correct" the affidavit in this respect.

material omissions in his application for a warrant"); *Escalera v. Lunn*, 361 F.3d 737, 743–44 (2d Cir. 2004) ("we look to the hypothetical contents of a 'corrected' application to determine whether a proper warrant application, *based on existing facts known to the applicant*, would still have been sufficient to support . . . probable cause to make the arrest as a matter of law. In performing this correcting process, *we examine all of the information the officers possessed when they applied for the arrest warrant*" (internal citations omitted; emphasis added)).

Lastly, Sanseverino contends that the affidavits represent falsely "that [the Defendants] *thoroughly* searched [the C.I.] for money and contraband before they sent him into the store." ECF No. 60-1 (emphasis added). But the affidavits plainly state: "The CI met Detective Majewski and your affiant at a pre-arranged meeting location where they were searched for money and/or contraband with none being located." ECF No. 61-3 at 2; *see also* ECF No. 61-4 at 2. This is a truthful statement in light of the uncontested fact that the C.I. was, at the very least, "patted down," ECF No. 68-1 ¶ 65, and therefore I do not "correct" the affidavit in this respect. *See Velardi*, 40 F.3d at 573 ("the plaintiff must show that the affiant . . . made false statements or material omissions in his application for a warrant").

<u>*Corrected Affidavit*</u>

In sum, the corrected affidavit would include that (1) the videos did not capture any drug transactions; (2) during the controlled purchase on October 4, 2021, the C.I. says, "you gonna have to plug me in with your people man, stop playing;" (3) approximately thirteen seconds after leaving the Mini Mart, the C.I. encountered two individuals, shook their hands very quickly, with his empty right hand visible afterwards, and then stated, "every time I be lookin' for it but I never find it"; and (4) the C.I. had nine felony convictions. The corrected affidavits would read, in relevant part, as follows (with corrections in bold):

Your affiant was contacted by a credible and reliable [C.I.] in regards to the illegal sale of narcotics from inside of 246 North Street . . . The C.I. has assisted the [NBPD] . . . with information in regards [to] narcotics trafficking within the city of New Brit[ai]n. Information given by the CI has been deemed to be truthful and reliable which was verified through police investigation. . . . **[The C.I. has been convicted of nine felonies.]** The CI explained that [he was] able to purchase crack cocaine from a white male who works at store located at the above listed location. ECF No. 61-3 at 1–2. *See also* ECF No. 61-4 at 1–2 (same).

The CI met Detective Majewski and your affiant at a pre-arranged meeting location where [he was] searched for money and/or contraband with none being located. The CI was provided with an amount of pre-recorded funds . . . as well as a live streaming video . . . device. The CI was instructed to travel directly to and from 246 North Street without stopping. The CI walked to 246 North Street and returned to the pre-arranged meeting location shortly after. The CI then handed your affiant a quantity of a white, rock like substance as well as two (2) bags of chips. Your affiant was able to positively identify the white, rock like substance as crack cocaine based on your affiant's training and experience as a police officer. ECF No. 61-3 at 2. *See also* ECF No. 61-4 at 2 (same except the affidavit states that the C.I. handed Conaway a "a loose cigarette" instead of two bags of chips during that controlled buy).

A sample of the white, rock like substance was subjected to a field test utilizing a 'NARK II Cocaine ID' wipe which yielded positive results to contain cocaine. ECF No. 61-3 at 3. *See also* ECF No. 61-4 at 3 (same).

The CI provided the following details in regards to the controlled drug purchase. The CI walked to 246 North Street and made contact with the white male who works at the store, behind the counter/cash register. The CI stated that the male handed the CI crack cocaine in exchange for cash and further stated that the male made the CI purchase two (2) bags of chips. Based on your affiant's training and experience as a police officer, your affiant is aware that persons selling narcotics out of stores will often have customers also purchase items such as food, clothing, etc. to conceal the fact that narcotics are being sold from the establishment. ECF No. 61-3 at 2–3. *See also* ECF No. 61-4 at 2–3 (same except the affidavit states that "the male made the CI purchase a loose cigarette" instead of two bags of chips during that controlled purchase).

The data recorded from the video and audio device utilized by the CI was uploaded to the [NBPD] Server. Your affiant viewed the footage**[. While it did show that the C.I. walked to 246 North Street and made contact with the white male who works at the store, it did not show whether a drug transaction occurred**. **Prior to leaving the Mini Mart, the video captures the C.I. stating: "You gonna have to plug me in with your people man, stop playing." Approximately thirteen seconds after leaving the Mini Mart, the C.I. encountered two individuals, shook their hands very quickly, and his empty right hand can be seen afterwards. He immediately walked away, continuing his route back to the car,**

> **stating, "every time I be lookin' for it but I never find it"]**. Your affiant was able to positively identify the white male behind the counter and conducting the **[alleged]** drug transaction as Anthony Sanseverino . . . after having several encounters with him as a police officer in the past. . . . Sanseverino is a convicted felon being previously convicted on charges to include Sale of a Controlled Substance, . . . Possession with Intent to S[ell] . . . He is described as a white male with short hair, approximately 5 feet 10 inches tall with a slim build." ECF No. 61-3 at 3. *See also* ECF No. 61-4 at 3 (same except for corrections in bold regarding route and statements made by C.I. during controlled purchase).

This information would support a finding of probable cause that Sanseverino had committed the crimes of Possession of Narcotics and Sale of Narcotics. Even though the video footage did not capture any of the alleged transactions, the C.I. had a record of providing reliable information and assisting the NBPD with narcotics trafficking in New Britain. The C.I. told the officers that he purchased narcotics during each of the three controlled buys, and what Detective Conaway *could* see on the video and what he reported observing when the C.I. returned, which was that after being searched the C.I. walked to the Mini Mart, spoke with the person behind the store counter for long enough for a transaction to take place, walked back, and handed over to the officers a bag of crack cocaine, support the C.I.'s version of events.[14] That the C.I. had a lengthy criminal record does not negate probable cause. Many confidential informants have criminal records, and officers could reasonably think that an informant's record could help him earn the trust of drug dealers during controlled purchases. And, lastly, the C.I.'s statements and brief handshakes with the two individuals on his way back from the October 4, 2021 controlled purchase have little bearing, if

---

[14] Sanseverino's suggestion that the officers did not actually retrieve crack cocaine from the C.I. and are not actually storing it in their evidence room amounts to speculation. As I explain below in the discussion of Sanseverino's spoliation claim, Defendants have pointed to evidence that explains why the "Inc Date" notation on the evidence log indicates September 22, 2021, for all three controlled purchases; in short, that is the date the case was opened, not the date the evidence was collected, as a review of Conaway's incident reports confirms. Sanseverino has submitted no evidence rebutting Defendants' evidence – and the statements in the warrant affidavits – that the officers collected crack cocaine from the C.I. following his return from the Mini Mart after each controlled purchase.

any, on probable cause. His empty hand right can be seen after those handshakes and there is no evidence that he went out of his way to interact with those individuals. The meaning of his statements during that one controlled purchase is unclear but the statements do not materially add to or detract from the facts supporting probable cause. Further, those brief handshakes occurred during only one of the controlled purchases that was the subject of only one of the affidavits. The other affidavit discusses a separate (the third) controlled purchase, during which the C.I. did not shake hands or interact with anyone besides the male behind the counter of the Mini Mart. *See* ECF No. 61-4 at 1. Under all these facts and circumstances, including that the C.I. had assisted with the September 22, 2021 controlled purchase in which he also handed over crack cocaine immediately after returning from the Mini Mart, a reasonable officer would believe that Sanseverino had committed the crimes of Possession of Narcotics and Sale of Narcotics. *See Jaegly,* 439 F.3d at 154 ("[P]robable cause depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest, and . . . the probable cause inquiry is objective rather than subjective." (quotation marks omitted)).

Accordingly, Defendants are entitled to summary judgment on the false arrest and malicious prosecution claims pertaining to Sanseverino's arrest for Possession of Narcotics and Sale of Narcotics pursuant to the warrants.

**B. Unreasonable Search and Seizure (Count Seven)**

The parties cross-move for summary judgment on the unreasonable search and seizure claim. Because the search warrant was supported by probable cause, the Defendants are entitled to qualified immunity on this claim.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[15] U.S. Const. amend. IV. "While a search pursuant to a warrant issued by a judicial officer upon a finding of probable cause is presumptively reasonable, that presumption can be defeated by showing that a defendant (1) knowingly and deliberately, or with a reckless disregard of the truth, procured the warrant, (2) based on false statements or material omissions, that (3) were necessary to the finding of probable cause." *Ganek*, 874 F.3d at 81 (internal citation and quotation marks omitted). I again apply the "corrected affidavit" doctrine, such that "if probable cause remains after the warrant is corrected, [the] plaintiff has suffered no violation of Fourth Amendment rights[.]" *Id.* at 82 (internal quotation marks omitted).

Sanseverino contends that "Defendants Conaway and Majewski deliberately made the *same* material [misrepresentation] and the *same* material omissions in their sworn affidavit to obtain a search and seizure warrant for the . . . Mini Mart, that they made in the arrest warrant affidavits." ECF No. 60-1 at 14 (emphasis added). The affidavit in support of the search warrant contains the same representations as the affidavits in support of the arrest warrants. *Compare* ECF No. 61-8 *with* ECF No. 61-3 *and* ECF No. 61-4. Accordingly, for the same reasons that I found that there was probable cause for Sanseverino's arrests after the affidavits were corrected, there was also probable cause to believe that the Mini Mart contained evidence of the crimes of Possession of Narcotics and Sale of Narcotics. So the Defendants are entitled to summary judgment on the search and seizure claim.

---

[15] The parties do not dispute that Sanseverino is entitled to Fourth Amendment protection with respect to the Mini Mart. *See* ECF Nos. 71 at 22–23; 60-1 at 14–15; *see also Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 329 (1979) ("there is no basis for the notion that because a retail store invites the public to enter, it consents to wholesale searches and seizures that do not conform to Fourth Amendment guarantees").

I note that although "probable cause to search exists where circumstances indicate a fair probability that contraband or evidence of a crime will be found in a particular place," *Ganek*, 874 F.3d at 82 (internal quotation marks omitted), and is "not to be confused with probable cause to think that the person whose premises are to be searched is implicated in the crime," *id.*, in this case, both types of probable cause converge at the Mini Mart. The Mini Mart was the target location of all three controlled purchases and where Sanseverino was identified as the individual behind the counter allegedly selling crack cocaine to the C.I. during each of the controlled buys. ECF No. 66-2 ¶¶ 3, 5–6, 9–11, 15–16; ECF No. 68-1 ¶¶ 5–6, 9–10, 13. Further, it is undisputed that Sanseverino owns and operates the Mini Mart.

Sanseverino contends that the unnecessary destruction of store property warrants summary judgment in his favor on the search and seizure claim. ECF No. 60-1 at 15. Sanseverino is correct that "[e]xcessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression." *United States v. Ramirez*, 523 U.S. 65, 71 (1998). And whether the Defendants caused damage to the Mini Mart is a disputed factual issue. ECF No. 68-1 ¶¶ 31, 67; ECF No. 66-2 ¶ 30.

But because the Fourth Amendment prohibits only "unreasonable" searches, it tolerates a minimal amount of damage while officers are carrying out a search, as long as the officers did not act maliciously or unreasonably. It is well recognized that "officers executing search warrants on occasion must damage property in order to perform their duty." *Dalia v. United States,* 441 U.S. 238, 258 (1979). "Before any due process liability can be imposed for property damage occurring in a lawful search, it must be established that the police acted unreasonably or maliciously in bringing about the damage. Mere negligence is not enough." *Cody v. Mello*, 59 F.3d 13, 16 (2d

Cir. 1995) (internal citations omitted). Here, the alleged damage to the Mini Mart is depicted in two photographs, which were taken of the area behind the counter in the Mini Mart. ECF Nos. 61-18 and 61-19; *see also* ECF No. 60-2 ¶ 69 (Sanseverino's 56(a)(1) statement: "The damaged merchandise and shelves behind the counter . . ."). The photographs corroborate Sanseverino's sworn statement that the Defendants and NBPD officers "caused damage to shelving units and merchandise located within the store . . . [which] included tossing boxes of tobacco products . . . and confectionary items." ECF No. 61-26 at 2. Sanseverino contends that the damage "amounted to approximately $900.00." ECF No. 60-1 at 15. It was plainly reasonable for officers to search thoroughly the area behind the counter in the Mini Mart for evidence of crimes related to the possession and sale of crack cocaine, given that the affidavit in support of the search warrant indicated that the C.I. had purchased cocaine from the "white male who works at the store, behind the counter / cash register." ECF No. 61-8 at 2. *See also id.* at 3 (same). And Sanseverino has pointed to no evidence suggesting any unreasonable or malicious conduct on the part of the Defendants. Viewing these facts in the light most favorable to Sanseverino, I find that the "tossed" merchandise depicted in the photographs is consistent with a lawful search for drugs in that area, rather than any unreasonable or malicious conduct, and no reasonable jury could conclude otherwise. *See Brown v. City of Utica, N.Y.,* 854 F. Supp. 2d 255, 262-63 (N.D.N.Y. 2012) ("The 'destruction' depicted in the pictures includes a cracked glass cabinet door, a closet door off its hinges, garbage strewn outside the home, clothing scattered on the floor inside the home, a radiator with its metal covering removed, and what appears to be a broken mirror or glass picture frame. However, the scene depicted in these images falls far short of establishing that defendants acted unreasonably or maliciously. . . . Moreover, the amount of damage to personal items and furniture was minimal. Indeed, at oral argument plaintiff's attorney estimated that less than $1000 worth of

damage was done. In short, no rational trier of fact could conclude, even viewing the evidence in the light most favorable to plaintiff, that defendants acted unreasonably or maliciously when executing the search warrant."); *see also Dockery v. Tucker*, 2008 WL 2673307, at *9–10 (E.D.N.Y. June 26, 2008) (finding that plaintiff's allegation that "defendants damaged two toilets and some electrical fixtures, and made holes in floors and ceilings . . . still fails on the merits . . . [b]ecause [the plaintiff] has failed to adduce evidence that such damage to the Premises as he alleges is anything more than ordinary disarray incident to the execution of the warrant, or that the officers' actions were malicious or unreasonable, defendants are entitled to summary judgment on this Fourth Amendment claim asserting a search of excessive scope causing unreasonable property damage." (quotation marks and alterations omitted)).

**C. Trespass (Count Three)**

The parties also cross-move for summary judgment on the trespass claim. Because I have found that the search was supported by probable cause, the Defendants did not commit a trespass.

In Connecticut, the elements of a common law trespass claim are "(1) ownership or possessory interest in land by the plaintiff; (2) invasion, intrusion or entry by the defendant affecting the plaintiff's exclusive possessory interest; (3) done intentionally; and (4) causing direct injury." *City of Bristol v. Tilcon Mins., Inc.*, 284 Conn. 55, 87 (2007).

The Defendants argue that because they entered the Mini Mart pursuant to a warrant supported by probable cause, Sanseverino's trespass claim fails because "[t]he tort of trespass . . . requires the unlawful entry on property, and probable cause clearly provides the requisite 'lawfulness' to defeat that element." ECF No. 71 at 25 (citing *Cotto v. City of Middletown*, 158 F. Supp. 3d 67, 88 (D. Conn. 2016)). Defendant's argument invokes the "firefighter's rule," which provides that "a public officer . . . on private property while lawfully present in the exercise of his

duties . . . occupie[s] a status akin to that of a licensee." *Furstein v. Hill*, 218 Conn. 610, 615 (1991) (internal quotation marks and citation omitted). "Under Connecticut common law, one who enters a property in the performance of a public duty under a permission created by law is a licensee, not a trespasser." *Marchand v. Simonson*, 16 F. Supp. 3d 97, 118 (D. Conn. 2014) (internal quotation marks omitted).

Because I have found that the search was supported by probable cause, Defendants did not violate Sanseverino's Fourth Amendment right when they searched the Mini Mart and therefore did not commit the tort of trespass. *See Levandoski v. Cone*, 267 Conn. 651, 653 (2004) (a "police officer who enters private property in the exercise of his duties occupies the status of a licensee"); *Waller v. City of Middletown,* 50 F. Supp. 3d 171, 197 (D. Conn. 2014), *order vacated in part on other grounds,* 89 F. Supp. 3d 279 (D. Conn. 2015) ("An officer has a privilege to trespass upon property, pursuant to an arrest warrant, if the entry comports with constitutional limitations.").

**D. Spoliation of Evidence (Count Eight)**

The amended complaint alleges that the Defendants engaged in "spoliation of evidence" because the allegedly seized narcotics "either never existed or were deliberately destroyed by the defendants in order to prevent their testing and exposure . . . at trial" and because "[d]uring the execution of the defective search warrant, . . . Defendants Conaway and Majewski, and other officers willfully disconnected and dismantled the surveillance cameras that were recording their conduct inside in order to conceal and destroy evidence of the defendants' misconduct." ECF No. 19 ¶¶ 80–81.

The parties cross-move for summary judgment on the spoliation claim. Because Sanseverino has not demonstrated that he is entitled to judgment as a matter of law on this claim,

and he has pointed to no disputes of material fact in response to the Defendants' motion, I grant the Defendants' motion and deny Sanseverino's motion on this claim.

"[T]he tort of intentional spoliation of evidence consists of the following essential elements: (1) the defendant's knowledge of a pending or impending civil action involving the plaintiff; (2) the defendant's destruction of evidence; (3) in bad faith, that is, with intent to deprive the plaintiff of his cause of action; (4) the plaintiff's inability to establish a prima facie case without the spoliated evidence; and (5) damages." *Traylor v. Awwa*, 899 F. Supp. 2d 216, 223 (D. Conn. 2012) (quoting *Rizzuto v. Davidson Ladders, Inc.,* 280 Conn. 225, 244–45 (2006)).

Sanseverino argues that when the search warrant was executed, an officer disconnected the Mini Mart's surveillance equipment, even though the search warrant did not authorize the disabling of surveillance equipment; no officers testified that doing so was necessary for the officers' safety; and the surveillance equipment was disconnected *after* Sanseverino was handcuffed and removed from the store. ECF No. 60-1 at 20. The search warrant, however, authorized the officers to search for and seize surveillance equipment, which reasonably included disabling any such equipment. ECF No. 61-8 at 6 ("I hereby command any Police Officer . . . to enter into . . . and search . . . 246 North Street in the city of New Brit[ai]n, Connecticut . . . for . . . Communication and interception equipment: such as, surveillance devices . . ."). And Prisavage did testify that the surveillance system was disconnected to prevent observers from compromising officer safety.[16] ECF No. 58-11 at 6–7 ("Q. Did you unplug the store video camera system? A. Yes, I did. Q. And can you tell us why? A. For officer safety. Generally you don't want counter

[16] Sanseverino argues that Prisavage "admitted in his deposition that he intentionally disconnected the plaintiff's surveillance cameras and modem in order to ensure that no video or audio footage existed to document the officers' conduct during the October 28, 2021 search." ECF No. 66-1 at 20. The portions of Prisavage's deposition testimony that Sanseverino cites, however, do not relate to the disconnecting of the cameras in the Mini Mart, and thus do not support Sanseverino's claim. ECF No. 61-17 at 1–5.

surveillance being conducted on our legal operation at the time, so officer safety."). Sanseverino admitted this fact by failing to respond with a citation to any evidence. ECF No. 66-2 ¶ 29; Local Rule 56(a)(3). And his argument that the concern for officer safety "defies credulity," ECF No. 66-2 ¶ 29, is unpersuasive because it fails to account for the possibility that third parties who were offsite might have had remote access to the system and thereby might have monitored the officers during the search—a possibility that the officers reasonably could have taken into account when they first entered the store.

In any event, Sanseverino's argument that he is entitled to judgment as a matter of law fails to address three of the five elements required to sustain a claim of spoliation. He has cited no facts to demonstrate that (1) the Defendants were aware of a pending or impending civil action; (2) he cannot establish his prima facie claims without the surveillance footage, especially in light of the plethora of body camera footage documenting the search; or (3) he suffered damages. ECF No. 60-1 at 19–20. Accordingly, Sanseverino's motion for summary judgment on this claim is denied.

With regard to the crack cocaine, the Defendants argue that the amounts allegedly recovered from the controlled purchases were not destroyed; and that the crack cocaine recovered during the Mini Mart search was destroyed pursuant to a state court judge's order. ECF No. 71 at 30. In response to the Defendants' motion, Sanseverino contends that the evidence log containing entries for the crack cocaine allegedly recovered from the controlled purchases does not contain dates matching when the controlled purchases occurred. ECF No. 66-2 ¶ 19; ECF No. 58-14 at 23. He therefore denies "whether the three plastic bags that they claim are present in the New Britain Police evidence locker, are what they say they are." ECF No. 66-1 at 18–19. The evidence log in question is reproduced below:

| Property Type | Description | Inc Date | Incident Nu | Item | Location | Custody | Status I | Custody ( | Purge I | Custody Change Reason |
|---|---|---|---|---|---|---|---|---|---|---|
| Drugs/Narcotics | (A) Crack Cocaine 1 (XX) Not Rep... | 09/22/2021 10:11 | IR21-027536 | 1 | Drugs Storage, shelf 4 box F | Checked In | 10/06/2021 | KRYSIAK, ROBERT, T | 12/31/2024 | |
| Other | Pampa/Jalapeno Peppers/Jalapeno ... | 09/22/2021 10:11 | IR21-027536 | 2 | Drugs Storage, shelf 4 box F | Checked In | 10/06/2021 | KRYSIAK, ROBERT, T | 12/31/2024 | |
| Drugs/Narcotics | (A) Crack Cocaine 1 (XX) Not Rep... | 09/22/2021 10:11 | IR21-027536-S1 | 3 | Drugs Storage, shelf 4 box F | Checked In | 10/06/2021 | KRYSIAK, ROBERT, T | 12/31/2024 | |
| Other | Wise/Two (2) bags of "Wise" bran... | 09/22/2021 10:11 | IR21-027536-S1 | 4 | Drugs Storage, shelf 4 box F | Checked In | 10/06/2021 | KRYSIAK, ROBERT, T | 12/31/2024 | |
| Drugs/Narcotics | (A) Crack Cocaine 1 (XX) Not Rep... | 09/22/2021 10:11 | IR21-027536-S2 | 5 | Drugs Storage, Shelf 4, BOX F | Checked In | 10/19/2021 | TARTAGLIA, GREGORY, J | 12/31/2024 | |
| Other | (1) Loose cigarette. | 09/22/2021 10:11 | IR21-027536-S2 | 6 | Drugs Storage, Shelf 4, BOX F | Checked In | 10/19/2021 | TARTAGLIA, GREGORY, J | 12/31/2024 | |
| Drugs/Narcotics | (A) Crack Cocaine 0.43 (GM) Gram... | 09/22/2021 10:11 | IR21-027536-S3 | 7 | Per c/o | Removed | 01/27/2023 | REYES, RAMON, R | 12/31/2024 | Destroyed |

ECF No. 58-14 at 23. The Defendants contend that the "Inc Date" column refers to the New Britain Police Department investigative case, "Incident Report Number 21-027536," which began on September 22, 2021. ECF No. 68-1 ¶ 49; *see also* ECF No. 73 at 5 n.15. This contention finds support in Conaway's incident reports, each of which separately describes each of the three controlled purchases, the execution of the search warrant, and the execution of the arrest warrant, and each of which states the "Incident Occurred from 09/22/2021 10:11 to 09/22/2021 10:11," which matches the entries in the "Inc Date" column for all of the items in the log. ECF No. 58-4 at 10 (Conaway Incident Report including "Incident Occurred from 09/22/2021 10:11 to 09/22/2021 10:11" and "Date of this Report: 9/23/2021 10:17" describing controlled purchase "during week of September 19, 2021"); *id.* at 14 (Conaway Supplemental Report including "Incident Occurred from 09/22/2021 10:11 to 09/22/2021 10:11" and "Date of this Report: 10/05/2021 14:00" describing controlled purchase "during week of October 3, 2021"); *id.* at 18 (Conaway Supplemental Report including "Incident Occurred from 09/22/2021 10:11 to 09/22/2021 10:11" and "Date of this Report: 10/18/2021 23:21" describing controlled purchase

"during week of October 17, 2021"); *id.* at 22–24 (Conaway Supplemental Report including "Incident Occurred from 09/22/2021 10:11 to 09/22/2021 10:11" and "Date of this Report: 10/28/2021 22:04" describing that on "October 28, 2021, the Search and Seizure Warrant was executed" and "[d]uring the search, Detective Kiely located and seized a small quantity of a white, rock like substance on the floor near the doorway leading into the cash register area . . . [and] was able to identify the substance as crack cocaine"); *id.* at 27 (Conaway Supplemental Report including "Incident Occurred from 09/22/2021 10:11 to 09/22/2021 10:11" and "Date of this Report: 10/28/2021 22:32" and describing that on "October 28, 2021, Anthony SANSEVERINO . . . was arrested on the strength of a hard copy warrant . . . [and] was taken into custody . . ."). Accordingly, the dates in the evidence log do not suggest that the crack cocaine was destroyed or lost, and no reasonable jury would credit Sanseverino's argument over the documentary evidence that fully explains the entries in the "Inc Date" column.

Because Sanseverino points to no disputed issues of fact material to the spoliation claim, I grant Defendants' motion for summary judgment.

**E. Violation of Conn. Gen. Stat. § 52-571k (Count Four)**

The parties cross-move for summary judgment on Sanseverino's claim for violation of Conn. Gen. Stat. § 52-571k. Because I have dismissed all claims arising under federal law, I decline to exercise supplemental jurisdiction over this claim and dismiss it without prejudice to Sanseverino refiling it in Connecticut Superior Court. 28 U.S.C. § 1367(c)(3).

## V. Conclusion

For the reasons set forth above, the Defendants' motion is GRANTED and Sanseverino's motion is DENIED. All counts are dismissed. The Clerk is directed to close the case.

IT IS SO ORDERED.

/s/

Michael P. Shea, U.S.D.J.

Hartford, Connecticut

September 16, 2026